United States District Court
Southern District of Texas
**ENTERED**
December 09, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | CRIMINAL ACTION NO. 4:20-cr-00212-2 |
| Prosecution, | § § § | |
| vs. | § § § | JUDGE CHARLES ESKRIDGE |
| JAMIE JULISSA VAZQUEZ, | § § § | |
| Defendant. | § | |

OPINION AND ORDER
DENYING MOTION TO SUPPRESS

The United States charges Defendant Jamie Julissa Vazquez with conspiracy to possess with intent to distribute more than fifty grams of methamphetamine and aiding and abetting its distribution in violation of federal law. This followed from the seizure of approximately seventeen kilograms of methamphetamine during a search of her vehicle after being stopped on the highway by an officer with the Harris County Constable's Office. She also made an incriminating statement in his presence once taken into custody.

The United States similarly charges Defendants Orlando Orozco-Islas and Diego Martinez with various aspects of possessing, distributing, and manufacturing methamphetamine. And Orozco-Islas is further charged with maintaining a drug-involved premises. All of those charges followed from the seizure of an additional 172 kilograms of methamphetamine at a trailer home in Fresno, Texas that law enforcement officers had under surveillance as part of a narcotics trafficking investigation.

Vazquez moves to suppress the methamphetamine seized from her vehicle and the statement she gave. Dkt 69. The posture is unusual because video evidence at the first of two hearings established that the putative traffic infraction originally articulated to justify her stop—following another vehicle too closely—occurred only because an officer working in coordination with the United States Drug Enforcement Agency deliberately pulled in front of Vazquez in an unmarked pickup truck. As determined below, it simply isn't credible that the arresting officer was unaware that the pickup truck was a law enforcement vehicle. And it's plainly impermissible for on-duty officers to create the very circumstances used to justify an investigatory traffic stop.

The Government argues in the alternative that either the stop was justified under the collective knowledge doctrine or the evidence should be admitted under the inevitable discovery doctrine. It contends under both theories that the validity of the alleged traffic infraction isn't dispositive because the stop occurred as part of the referenced narcotics trafficking investigation. And indeed, Vazquez was observed at the Fresno trailer home just prior to her arrest, where Orozco-Islas and Martinez placed a cardboard box into the rear compartment of her vehicle. Officers then followed her away from the trailer home upon her departure, ultimately finding the seventeen kilograms of methamphetamine in that box.

The arrest reports and testimony at the suppression hearings establish that reliable information from a confidential informant gave rise to reasonable suspicion that narcotics trafficking was afoot, implicating Vazquez well prior to the traffic stop. Once she departed the trailer home, sufficient reasonable suspicion existed to support the stop. Alternatively, upon her departure, a sequence of events was set in motion that would inevitably lead to the discovery of the methamphetamine placed into her vehicle.

The motion to suppress as to the methamphetamine is thus denied. And because no constitutional violation occurred at the inception of or during the stop, the

statement made by Vazquez while in custody needn't be suppressed. To the contrary, she received *Miranda* warnings and thereafter voluntarily made the statement.

The motion to suppress is denied.

1. Findings of fact

The arrest and seizure of the evidence at issue occurred on January 16, 2020. It derived from a narcotics trafficking investigation involving the DEA, the City of Houston Police Department, and the Harris County Constable's Office. But that wasn't initially apparent given the way the facts emerged over the course of two hearings.

The following facts are found to be credible and true based upon the testimony and evidence, except where stated expressly to be not credible or untrue. The evidence received and reviewed includes video from certain body and dashboard cameras. See Dkts 117 (Ex 2, Woods dashboard camera, approximately six minutes; Ex 3, Skero body camera, approximately thirty-two minutes); 118-1 (Skero dashboard camera, approximately two minutes); 118-4 (Skero body camera, approximately four minutes).

The initial suppression hearing took place on January 25, 2021. The Government initially responded to the motion to suppress solely on the basis that Vazquez "was lawfully stopped for violating the traffic laws of Texas" and then gave knowing and voluntary consent to the search of her vehicle. Dkt 75 at 10. And so it sponsored testimony in that regard from Bryan Skero, an officer with the Harris County Constable's Office. See Dkt 100 at 7–97.

Skero testified to seeing Vazquez's vehicle following too closely behind a silver Dodge Ram pickup truck on the Sam Houston Parkway in Southwest Houston. Dkt 100 at 9–10; see also Dkt 118-1 at 0:00:01, and 117 (Ex 2) at 0:04:13. Following another vehicle too closely is a violation of Texas Transportation Code § 545.062(a). Skero thus pulled her over, exited his vehicle, and began talking with her. Dkt 100 at 15–16; Dkt 117 (Ex 3) at 13:48:28 to 13:52:41.

Upon inquiry, Vazquez stated that she didn't have a driver's license or any insurance information, and that

3

although she had a Texas identification card, she didn't have it with her. Vazquez then handed Skero a court summons for a recent, prior speeding ticket that contained identifying information. She also provided Skero with her full name of *Jamie Julissa Vazquez-Herrera* and her date of birth. Skero advised her that she'd been stopped for following a pickup truck too closely. Vazquez confirmed that she had neither a current driver's license nor insurance coverage. She also stated that she was from California, was only recently in Texas, and was that day visiting a friend at a nearby location. Skero also asked questions about her address, job, and travel plans. Dkt 117 (Ex 3) at 13:48:42 to 13:53:18; Dkt 100 at 18–22.

Skero returned to his cruiser to confirm her identity and check for any outstanding warrants. He provided dispatch with various iterations of her name. This took several minutes, with no records found. As he waited, Skero mentioned to an officer in the cruiser with him that he was going to get her out of the vehicle to speak with her further because it was unsafe to do so standing beside the vehicle, given where it was parked. The video showed that Vazquez had stopped in the median between the highway and an entry ramp, which meant that vehicles were passing by at high speeds on both the left and the right. Dkt 117 (Ex 3) at 13:53:20 to 13:59:22; Dkt 100 at 22–25.

Skero returned to Vazquez's vehicle and asked her to exit so that he could talk with her on the median behind her vehicle. He informed her that he couldn't find any identification records under her name. They further discussed the status of her Texas identification card and her current address. Upon inquiry, Vazquez stated that she'd never been in any trouble, and that the speeding ticket was her first. Skero asked if she had anything illegal in the vehicle, and she shook her head in the negative. He then asked for consent to search the vehicle to confirm that fact, and she nodded in the affirmative. Vazquez also stated that she thought she had a college identification card in her vehicle. Dkt 117 (Ex 3) at 13:59:30 to 14:02:20; Dkt 100 at 25–28.

Skero proceeded to search the front driver compart-
ment, documents in the center console, Vazquez's purse in
the passenger seat, and her backpack in the rear seat. He
twice brought materials out to inquire if her college ID
would be in any of them, but it wasn't. Dkt 117 (Ex 3)
at 14:02:25 to 14:05:10; Dkt 100 at 29–31.

Skero then opened the rear hatch door of the vehicle
and saw the cardboard box. He asked Vazquez about the
contents, and she told him that it was a "replacement
device" for a "baby monitor" as "a gift" for a friend. The box
was sealed with electrical tape. Skero asked who had
opened it, and she replied that she had bought it "offline."
Skero then asked Vazquez twice if he could open the box,
and she nodded in the affirmative each time. Skero cut the
tape, opened the box, found methamphetamine,
immediately placed Vazquez in handcuffs, and gave her
*Miranda* warnings. He questioned her briefly about the
contents, but she remained silent. Skero specifically asked
her if she wanted to talk, and she shook her head in the
negative. Further questioning ceased. Dkt 117 (Ex 3)
at 14:05:17 to 14:07:44; Dkt 100 at 32–38.

Given their unsafe location on the highway, Vazquez
and her vehicle were driven to a nearby toll plaza. From
there, Skero drove Vazquez back to the trailer home.
Vazquez initiated discussion with Skero during the drive,
mentioning her plans to meet her child and the child's
father in California. Dkt 100 at 38–40; Dkt 117 (Ex 3)
at 14:11:00 to 14:20:00.

Several hours after they arrived at the trailer home,
Vazquez asked for permission to call her child's father to
inform him of what was occurring. Skero agreed, and
Vazquez remained in his presence for the duration of the
call. During the call, Vazquez stated, "Um, remember that
I told you that, that I got offered to do something stupid? . . .
I got a call from what I talked to you about and um, I
decided to come and basically um, I'm going to jail for it."
Dkt 118-4 at 16:15:44 to 16:17:21; Dkt 100 at 39–44.

On cross-examination, defense counsel first had Skero
identify a silver Dodge Ram pickup truck onsite at the toll

plaza after the arrest. Skero testified that it belonged to Officer Bryan Leach of the Rosenberg Police Department, who was also working in coordination with the DEA. Dkt 117 (Ex 3) at 14:10:52; Dkt 100 at 53–56. Review of video excerpts of the traffic stop itself then confirmed what appeared to be the same pickup truck intentionally move directly in front of Vazquez's vehicle, very shortly after which she was stopped for tailgating it. But the quality of the video wasn't sufficient to confirm the license plate number. Dkt 117 (Ex 2) at 0:04:11 to 0:05:15; Dkt 100 at 55–58.

Skero professed that, at the time of the stop, he hadn't noticed or known that the pickup truck belonged to Leach. Dkt 100 at 53, 58–59, 87–92. That simply isn't credible. It is instead expressly found that Skero knew that Leach was driving the pickup truck when it created the putative traffic violation. Indeed, Skero testified to knowing both Leach and his vehicle. Id at 53–58, 83–88. And it was later established (as discussed below) that Skero was actually participating in a larger narcotics trafficking investigation at the time that involved at least eight unmarked vehicles. See Dkt 120 at 27–28, 46–47, 88.

Upon inquiry by the Court, counsel for the Government couldn't state whether an officer was driving the silver pickup truck. He committed to make inquiry in that regard. The hearing adjourned, with supplemental briefing ordered prior to resumption of the hearing. Id at 98–99, 119–21; see also Minute Entry of 01/25/2021.

The suppression hearing resumed on April 13, 2021. In its supplemental brief, the Government confirmed that Leach was in fact driving the pickup truck at the time of the infraction. Dkt 102 at 3. Even so, it persisted that Vazquez "was lawfully stopped for violating the traffic laws of Texas." Id at 15. And it also argued for the first time that reasonable suspicion for the stop existed irrespective of any traffic offense due to an ongoing narcotics trafficking investigation, which permitted the stop by Skero based upon the collective knowledge doctrine. Id at 5–8.

In support, the Government sponsored testimony from Fernando Villasana, an officer with the narcotics division of the Houston Police Department. He's also assigned to the DEA's High Intensity Drug Trafficking Area task force. Dkt 120 at 10–11. He testified credibly and in considerable detail to events preceding the traffic stop as follows. Dkt 120 at 10–109.

Officials began investigating "a major drug trafficking organization" over one year prior to Vazquez's arrest. Officers were told by an unspecified source during that investigation "that a source of supply based in Houston was going to be" in Fresno, Texas at 4109 Emerald Lane. That address, the source suggested, was being used as a "stash house" and "meth lab." Dkt 120 at 15–16.

Officers drove to the address and observed a trailer home, which they eventually discovered was occupied by Defendant Orlando Orozco-Islas. Id at 14–19; Dkt 71 at 16. Villasana testified that he ran the license plates of vehicles at the address. Dkt 120 at 14–15, 77. He also conducted surveillance on the property a minimum of "10 to 12 times" before January 15, 2020, which included everything from a stake out lasting "a couple of hours" to drives past. Id at 16–17, 78. But he observed nothing of significance on those occasions, testifying that he had seen no drug deals, no deliveries, and no other known drug dealers. Id at 78–80. However, four to five months before the stop of Vazquez, the wife of Orozco-Islas was arrested with one kilogram of heroin and two kilograms of methamphetamine in a car registered to the trailer home. And officials had previously seen Orozco-Islas driving that same car. Id at 18.

The arrest on January 16th occurred following two tips from a confidential informant known to Villasana for just over five years. Dkt 120 at 11, 77. Villasana first spoke to his source in the early evening of January 14th. Id at 106. The informant specified that Orozco-Islas had "received a large shipment of methamphetamine ice," and that "wherever it was that he had it stored, he was actually cooking it . . . letting it dry so that it could be sold." Id at 18–19; see also id at 107. The informant stated that it "was

up to 200 kilos of methamphetamine ice." Id at 100. Of note, 188 kilograms was cumulatively seized from Vazquez's vehicle on the stop and the trailer home on later search. Id at 100–01.

Villasana established surveillance of the trailer home on January 15th, where he observed the BMW belonging to Orozco-Islas. Id at 20–21. Throughout the day, other officers followed Orozco-Islas to and from the location but saw nothing of importance. Villasana also observed nothing of note during his time on location from 9 AM to 10 PM. Id at 22–23.

But that day, the source once again contacted Villasana. Id at 109. This time the informant stated that Orozco-Islas "was actually using the trailer" to cook the methamphetamine, with a "drug deal" planned for the next day, January 16th. Id at 26; see also id at 78. The informant didn't identify Vazquez, and Villasana wasn't otherwise previously aware of her. Id at 80. But the informant told him that "wherever it was that [Orozco-Islas] was cooking, wherever the trailer was, that's where they would be leaving," and that "the courier would be female." Id at 26. The informant also noted that "Orozco-Islas would not be driving the narcotics in his car" because he "feared driving because of the arrest of his wife." Id at 26–27.

Villasana met with Skero in person at a service station later on the 15th. Id at 27–29, 55; see also id at 163 (same per Skero). Villasana told him of the reason to believe that Orozco-Islas may be cooking a large quantity of methamphetamine at the trailer home and selling wholesale, and that "we'd be conducting a traffic stop." Id at 28; see also id at 55–56. Villasana also gave Skero the frequency for the encrypted radio channel that the team of officers would be using the next day. Id at 31; see also id at 165 (same per Skero).

On January 16th, Villasana was "on the 'eye'"— meaning that he was the primary surveillant of the trailer home and relayed his observations to other officers (including Skero) through the encrypted radio channel. Id at 29–30. Villasana's testimony made clear that all of the

following observations were conveyed over the radio to everyone on the team. And Skero testified that he was on that radio channel as of noon that day and heard the information that Villasana relayed. Id at 166–69.

Defendant Diego Martinez arrived at the trailer home in a silver Jaguar at about 12:15 PM. He parked outside a gate at the driveway. Orozco-Islas opened the gate to allow him in, after which the two walked back to the trailer home and went inside. Martinez wasn't previously familiar to Villasana. Id at 32–35; see also id at 63.

Vazquez then arrived fifteen to twenty minutes later in a white Chevy Equinox SUV. The two men came out, and Orozco-Islas this time opened the gate wide enough for Vazquez to pull in and down the driveway to park beside the trailer home. Vazquez stopped at the entry door and got out of her vehicle but didn't go inside. After a short conversation between Orozco-Islas and Vazquez, the two men entered the home and returned carrying a box together. Id at 35–40, 82–83. Vazquez opened the rear hatch of her vehicle, and they placed the box inside. Id at 40. Vazquez never opened the box or touched it in any way. Id at 82–83. Vazquez then got back into her vehicle, and Martinez and Orozco-Islas got into the Jaguar. Id at 41. Both vehicles departed the premises. Id at 41–42.

Villasana testified that he believed this sequence of events to be consistent with what the informant had told him, such that "all of the information [was] proven to be reliable and true." Id at 41. Villasana advised over the radio that "priority is going to be the small SUV with the female driving" and "per the information, that's probably where the narcotics are." Id at 43.

The traffic stop was ultimately made on an area highway some five miles away. Villasana testified that he arranged it that way because, if no narcotics were found, it would be "easier not to reveal the fact that we knew about the trailer." Id at 45. Villasana testified that he broadcast the following over the radio channel:

> I said, "Listen," I said, "If we can't, let's see
> if we can establish—on your own, if you can
> establish a traffic violation or reason for a
> stop. Otherwise we're still going to make
> the stop in regards to probable cause or in
> regards to the information that I had what
> I believe to be Ms. Vazquez in violation of
> transporting narcotics."

Id at 46. He elsewhere testified that he specifically told the marked units, "'Let's see if you can find any traffic—if you find traffic,' which would have been a traffic violation . . . . 'If not, we'll go ahead and—we'll just go ahead and make the stop.'" Id at 60. And he further testified:

> It was a narcotics investigation from the
> outset. Obviously [Skero] wasn't sitting out
> there for a traffic violation. We were going
> to stop—if Skero would have showed up, we
> could have stopped them. DEA does have
> vehicles—does have lights and sirens so we
> could have stopped them on our own if we
> wanted, but it just would have been much
> safer and easier for them.

Id at 46–47.

Skero also resumed and completed his testimony. Dkt 120 at 162–91. He stated that he met with Villasana in person on January 15th, where Villasana briefed him on the narcotics trafficking investigation. Id at 163–65. At approximately noon on the 16th, Skero tuned into the encrypted radio channel over which Villasana was broadcasting his observations. Id at 166–67. Skero confirmed that that he was listening to the encrypted channel and heard Villasana's instructions. Dkt 120 at 168–70. He again addressed the putative traffic infraction, and he concluded with a description of his department's vehicle impoundment and inventory procedures. Id at 171–75, 177–79.

Additionally, Leach testified to explain his actions as the driver of the silver pickup truck involved in the traffic

infraction. Dkt 120 at 110–61. He stated, "When it was clear there was going to be a traffic stop made, I passed her vehicle and got in front of her just in case when the lights came on, and like people often do she decides to flee, she would hit the back of my rental vehicle versus hitting somebody else." Id at 118. He also testified to his own belief that his pulling in front of Vazquez "didn't cause a dangerous situation with her in terms of being too close to her." Id at 144. And he responded in the negative when asked directly if his vehicle was too close to hers. Id at 143.

Close review of the video evidence shows that there were no cars in front of Vazquez until Leach moved his truck into the lane in front of her. It also confirms that Vazquez maintained approximately the same distance from Leach's truck as when he entered her lane until Skero initiated the traffic stop. The ability of Vazquez to make a lane change was also constrained by a white Dodge Ram pickup truck in the lane to her immediate right. Dkt 118-1. Related testimony from Villasana established that this truck, too, was an unmarked police vehicle. Dkt 120 at 90. And Villasana testified that there were "eight or nine" other units on the highway during the events, although he couldn't specify which of the other vehicles near and around Vazquez were officers. Id at 88.

Of note, the overall narrative provided by Villasana was entirely credible. He had previously given consistent testimony before Magistrate Judge Andrew Edison at Vazquez's prior detention hearing on February 20, 2020. Dkt 71 at 13–40. He testified there that Vazquez was stopped for committing a traffic violation. Id at 21, 34–36. But the facts pertinent to a suppression inquiry weren't at issue or otherwise developed when he also testified about the narcotics trafficking investigation on a more general level. Id at 16–21.

It is likewise important that justification for the stop on reasonable suspicion of narcotics trafficking was consistent with two reports prepared immediately after Vazquez's arrest. One was written by Villasana's partner, Officer Greg Donavan. Dkt 112. It states that Skero and

other assisting officers had been requested to use "their marked units to conduct a traffic stop on each vehicle if they observed any traffic violations." Id at 2. But it further specifies that Villasana and other officers had a nearby location under surveillance for suspected narcotics trafficking, and that officers stopped Vazquez only after the events at the trailer home had been observed. Id at 1–2. The other is from Skero. Dkt 111. It, too, specifies a traffic violation as the basis for the stop. Id at 3. But it also states that he and his partner had been staged to that area at the request of DEA agents conducting a narcotics investigation at the location from which Vazquez departed. Ibid.

2.   Legal standard

a.   Fourth Amendment

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

This textually "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *United States v Leon*, 468 US 897, 906 (1984). But the Supreme Court long ago established the exclusionary rule, which provides that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v Calandra*, 414 US 338, 347 (1974), citing *Weeks v United States*, 232 US 383 (1914), and *Mapp v Ohio*, 367 US 643 (1961). This "operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party

aggrieved.'" *Leon*, 468 US at 906, quoting *Calandra*, 414 US at 348. And "evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial." *Elkins v United States*, 364 US 206, 223 (1960).

A defendant seeking to suppress seized evidence generally "has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of her constitutional rights." *United States v Guerrero-Barajas*, 240 F3d 428, 432 (5th Cir 2001). But if "the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by the preponderance of the evidence, that the search or seizure was constitutional." Ibid.

> b. Fifth Amendment

The Fifth Amendment to the United States Constitution in relevant part states, "No person shall . . . be compelled in any criminal case to be a witness against himself." In *Miranda v Arizona*, the Supreme Court found that an individual's Fifth Amendment privilege against self-incrimination is "jeopardized" when he or she is in custody and subjected to questioning. 384 US 436, 478 (1966). And so it held, "Procedural safeguards must be employed to protect the privilege." Id at 478–79. With that, the Supreme Court detailed the now-familiar list of rights of which an individual in custody must be made aware. Id at 479.

A defendant must expressly and unambiguously invoke these rights. *Berghuis v Thompkins*, 560 US 370, 381 (2010). Government actors must then scrupulously honor any such invocation. *Miranda*, 384 US at 479 (1966). But an individual may also "knowingly and intelligently waive these rights and agree to answer questions or make a statement." Ibid. When a defendant seeks to suppress a statement he or she made, "the state bears the burden of proving by a preponderance of the evidence that a

defendant has waived the protections established by *Miranda*." *Self v Collins*, 973 F2d 1198, 1206 (5th Cir 1992), citing *Colorado v Connelly*, 479 US 157, 168–69 (1986).

3. Fourth amendment issues

Stopping a vehicle and detaining its occupant constitutes a "seizure" under the Fourth Amendment. *United States v Brigham*, 382 F3d 500, 506 (5th Cir 2004). And warrantless seizures "are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v Kelly*, 302 F3d 291, 293 (5th Cir 2002).

One such exception derives from *Terry v Ohio*, 392 US 1 (1968). This is a "very narrow exception," allowing police officers to briefly detain a person for investigative and safety purposes "if they can point to 'specific and articulable facts' that give rise to reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime." *United States v Monsivais*, 848 F3d 353, 357 (5th Cir 2017), quoting *United States v Hill*, 752 F3d 1029, 1033 (5th Cir 2014). *Terry* also established a two-part framework by which to evaluate the legality of police investigatory stops—*first,* whether "the officer's action was justified at its inception," and *second,* if so, whether the officer's subsequent actions were "reasonably related in scope to the circumstances which justified the interference in the first place." 392 US at 19–20. This same framework applies to assess the constitutionality of traffic stops. See *Rodriguez v United States*, 575 US 348, 354 (2015); *Brigham*, 382 F3d at 506.

The Government argues two distinct justifications in support of Skero's decision to stop Vazquez. Dkt 102. One is his observation that she was following too closely to the pickup truck driven by Leach, in violation of Texas Transportation Code § 545.062(a). The other is his collective knowledge of suspected drug activity. Those are addressed in turn, followed by consideration of whether subsequent actions were reasonably within the scope of the stop. The Government makes further and related argu-

ments as to consent and inevitable discovery, which are addressed thereafter.

### a.   Justification at inception

For a traffic stop to be *justified at its inception*, an officer "must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v Lopez-Moreno*, 420 F3d 420, 430 (5th Cir 2005). When inquiring into reasonable suspicion, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." Ibid, quoting *United States v Arvizu*, 534 US 266, 273 (2002) (quotation marks omitted). Reasonable suspicion exists when an officer "can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." Ibid. While an officer's basis for suspecting wrongdoing can't be based on a "mere hunch," reasonable suspicion doesn't need to rise to the level of probable cause. Ibid, citing *Terry*, 392 US at 27, and *Arvizu*, 534 US at 274. And importantly, "reasonable suspicion 'need not rule out the possibility of innocent conduct.'" *Navarette v California*, 572 US 393, 403 (2014), quoting *Arvizu*, 534 US at 277.

### i.   Observation of a traffic violation

To be clear at the outset, a pretextual arrest in the sense of arresting someone on a valid basis without disclosing that a more serious basis also exists doesn't necessarily violate the Fourth Amendment. An example is *United States v Escalante*, 239 F3d 678 (5th Cir 2001). An officer there stopped an individual for careless driving but truly desired to investigate the defendant for drug smuggling. The defendant consented to a search of his vehicle, and the officer discovered twenty kilograms of cocaine. Id at 679, 680 n 8. Acknowledging that the stop may have been pretextual, the Fifth Circuit still held that "a traffic stop, even if pretextual, does not violate the Fourth Amendment if the officer making the stop has 'probable cause to believe that a traffic violation has

occurred.'" Id at 680–81, quoting *Whren v United States*, 517 US 806, 810 (1996). And so it upheld the stop because the officer had probable cause to believe that the defendant violated the traffic code. 239 F3d at 681. *See also United States v Causey*, 834 F2d 1179 (5th Cir 1987, *en banc*) (upholding arrest based on valid warrant for failure to appear in court where officers actually wanted to question defendant about separate robbery).

But law enforcement officers contriving the very circumstances that result in an arrest is naturally problematic. That's the first question here—whether an investigatory traffic stop exceeds Fourth Amendment limitations when involved law enforcement officers create the traffic infraction used to justify that stop.

Perhaps it's not surprising that courts have rarely addressed officer involvement in the creation of circumstances leading to a traffic or other investigatory stop. One example, however, is *United States v Holmes*, 2000 WL 353145 (7th Cir). Law enforcement officers there stopped the defendant for jaywalking, ran a check and confirmed an outstanding warrant, and took the defendant to jail. The officers then found a gun while conducting an inventory of the patrol car that transported the defendant, which he later admitted to possessing. Id at *1.

The district court denied the motion to suppress the gun, but the Seventh Circuit reversed. Id at *2, *5. It first noted that walking in the street didn't violate any Milwaukee jaywalking ordinance "unless traffic is thereby obstructed." Id at *4. And the government conceded that the defendant obstructed traffic "only because the officers decided to follow him." Ibid. The court then emphasized the noncontroversial proposition that law enforcement can't "manufacture exigent circumstances" to justify a warrantless search. Ibid; see also *United States v Rodea*, 102 F3d 1401, 1409 (5th Cir 1996). Likewise, it determined that the officers in the patrol car couldn't have reasonably believed the defendant was violating the jaywalking ordinance because the only "traffic" obstructed was the patrol car itself. The Seventh Circuit thus held that "the officers

lacked reasonable suspicion for stopping" the defendant. *Holmes*, 2000 WL 353145 at *4.

Similar facts being present here, a similar result obtains. An on-duty officer involved in this arrest created the very traffic violation that purportedly justified Vazquez's stop. Said differently, Vazquez wasn't violating Texas Transportation Code § 545.062 until (if ever) Leach's truck moved in front of her vehicle. See Dkt 100 at 47. Giving sanction to such conduct would obliterate the confines of what is intended to be a "very narrow exception." *Monsivais*, 848 F3d at 357, quoting *Hill*, 752 F3d at 1033 (quotation marks omitted).

To the contrary, the protections of the Fourth Amendment are zealously guarded. Indeed, the United States Supreme Court in *Delaware v Prouse* struck down "spot checks" of vehicles lacking reasonable suspicion as unconstitutional, while noting previous cases where it "insisted that the discretion of the official in the field be circumscribed." 440 US 648, 661 (1979) (collecting citations). And this was so even as it noted that "acting upon observed violations" is the "foremost method of enforcing traffic and vehicle safety regulations." Id at 659.

Such precedent counsels against yielding to "unbridled discretion of law enforcement officials." Ibid. The Government can't rely on the officer-induced traffic violation as a justification for the stop.

ii.    Reasonable suspicion of drug activity

Once it was established that an involved officer's unmarked vehicle created the alleged traffic infraction, the Government offered the alternative argument that the ongoing narcotics trafficking investigation provided reasonable suspicion for the stop. This turns on whether Villasana's knowledge of the evidence—and particularly his knowledge of the tips by a trusted confidential informant—gave rise to reasonable suspicion, and further, whether that knowledge can be attributed to Skero through the collective knowledge doctrine.

### A.   Reliance on informant's tip

Viewed in isolation, the actions taken by Vazquez on January 16th don't alone create reasonable suspicion that she was engaged in drug activity. See *United States v Monsivais*, 848 F3d at 357. But there was substantially more information giving context to what was observed, all deriving from contemporaneous tips by a reliable confidential informant.

The Fifth Circuit looks to several factors when assessing reasonable suspicion resulting from an informant's tip, including:

- o *First,* the credibility and reliability of the informant;
- o *Second,* the specificity of the information contained in the tip or report;
- o *Third,* the extent to which the information in the tip or report can be verified by officers in the field; and
- o *Fourth,* whether the tip or report concerns active or recent activity, or has instead gone stale.

*United States v Martinez*, 486 F3d 855, 861 (2007), quoting *United States v Gonzalez*, 190 F3d 668, 672 (5th Cir 1999). This is a "totality of the circumstances" test. *Alabama v White*, 496 US 325, 328 (1990). "No single factor is dispositive," and a "deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other[s], or by some other indicia of reliability." *United States v Jackson*, 328 F App'x 933, 936 (5th Cir 2009), quoting *United States v Jackson*, 818 F2d 345, 348 (5th Cir 1987) (quotation marks omitted).

*As to the credibility and reliability of the informant.* Villasana testified that he has known this confidential informant for just over five years. Dkt 120 at 77. He's used this source on many occasions, leading to several successful seizures of controlled substances and resulting in between fifteen and eighteen indictments, with another ten to fifteen pending. Id at 12–14, 72. Villasana observed that

he's had other informants who do mislead, but that this person has never given information "found to be inaccurate." Id at 76. To the contrary, he stated that "all the information has been true, reliable and correct throughout the time I've used this source." Id at 14.

*As to the specificity of the information contained in the tip*. The information conveyed by the informant to Villasana wasn't entirely precise as to location or the parties involved. But the informant did provide five key details. *First,* the transaction would occur on January 16, 2020. *Second,* it would involve Orozco-Islas, who was already suspected of being involved in a major narcotics operation, and whose wife had previously been arrested in possession of a substantial quantity of methamphetamine. *Third,* though the address wasn't specified, "they would be leaving from" the trailer home putatively used by Orozco-Islas to cook methamphetamine. *Fourth,* the courier who would transport the drugs would be a female. And *fifth,* Orozco-Islas wouldn't be in the vehicle with the narcotics. Id at 26–27.

*As to the extent to which the information in the tip was verified by officers in the field*. The officers verified each key detail. The transaction occurred on January 16th. It took place in the presence of Orozco-Islas at a trailer home that officers suspected he used to cook methamphetamine. The driver of the SUV into which the two men loaded the box was a female. And Orozco-Islas drove in a separate vehicle. Dkt 120 at 32–41. As Villasana testified, "That was—for me that was the key element, the fact that now all of the information is proven to be reliable and true. Now we have a female who could possibly be a courier. In my mind at that time, I had two individuals who were placing a box in the back of a hatch and so to me I had met all the elements that I was looking for." Dkt 120 at 41.

*As to whether the tip concerns active or recent activity*. Far from stale information, the ultimate and specific tip came the day before the transaction itself. And it "contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip,

but to future actions of third parties ordinarily not easily predicted." *Illinois v Gates*, 462 US 213, 245 (1983).

In sum, Villasana had a "'particularized and objective basis' for suspecting legal wrongdoing." *Lopez-Moreno*, 420 F3d at 430, quoting *Arvizu*, 534 US at 273. Courts have found that reasonable suspicion exists in similar cases.

A closely analogous case is *United States v Ocampo*, 890 F2d 1363 (7th Cir 1989). There, a reliable informant told officers that a defendant (whom the informant described as "a male Columbian in his late twenties or early thirties with black hair and a large build") was expecting a large cocaine shipment. The informant knew that the defendant used several locations to store his cocaine, but he could only identify the location of one specific apartment complex. Officers established surveillance, and on the third day witnessed a car pull into the back of the building. Two men exited the vehicle, both of whom matched the defendant's description. One carried a white plastic bag, while the other "stopped and scanned" the surrounding area, which the court found to constitute "countersurveillance." The pair entered an apartment, remained for fifteen to twenty minutes, then walked out of the building, again conducting countersurveillance. They got into the vehicle, and officers initiated a stop. Id at 1366. The Seventh Circuit held that the tip, taken together with law enforcement observations, provided officers "a particularized and objective basis to make an investigatory stop." Id at 1368, *quoting United States v Cortez*, 449 US 411, 417 (1981).

Also supportive is *United States v Powell*, 732 F3d 361 (5th Cir 2013). A known informant with first-hand knowledge of events stated that the defendant and a female were on their way to the informant's house in Midland, Texas driving in a Ford Fusion or Focus that contained a large quantity of crack cocaine, while also providing the first three letters of the license plate on the car. Two hours later, police saw a car matching the informant's description driving on the most direct route to Midland. They followed that car to the outskirts of the town, at which time officers

stopped the vehicle. The driver was in fact the defendant, and he did have a female with him. In his motion to suppress, the defendant attacked the informant's credibility, as officers had discovered that the informant was selling crack cocaine. But the Fifth Circuit found, "A total evaluation of these factors shows that the informant tip was supported by sufficient 'indicia of reliability' to satisfy the reasonable suspicion requirements under *Terry*." Id at 370–71; see also *Alabama v White*, 496 US 325 (1990).

These cases show varying degrees of specificity and verifiability in the information received. In *Ocampo*, a reliable informant provided general details regarding the description of the individual and the potential location of drug activity without providing a specific date. In *Powell*, a less reliable informant provided a particularized description of the vehicle and the parties, as well as predictive information regarding where those parties were traveling. Both were sufficient. Likewise here, a reliable informant with an established track record significantly longer than the informant in *Powell* provided predictive details that were more concrete than those provided by the informant in *Ocampo*. And like both of those cases, the predictive elements of the tip came to fruition. It should also be kept in mind that, unlike the suspects in *Ocampo* and *Powell*, Orozco-Islas was already under investigation and some evidence of his relation to the narcotics trade had already been established.

Vazquez argues that *United States v Spears*, 636 Fed App'x 893, 899 (5th Cir 2016), is "very similar" to her situation. Dkt 120 at 208–09; Dkt 105 at 8–10. The Fifth Circuit there found the following justification for a traffic stop to be inadequate:

> Spears visited the New York House, which had been the site of an attempted drug transaction with a confidential informant the day before, was where a suspected drug dealer lived, and had previously been visited by a person very soon before that person sold drugs to an undercover officer;

> Spears backed his truck into the driveway in a manner that obstructed the driver's side and the passenger's side of the truck from the view of the officers; Spears had an out-of-state license plate; multiple vehicles arrived at the New York House near the time Spears arrived at the New York House; and Spears stayed at the New York House for only ten to twenty minutes.

636 Fed App'x at 899. The Fifth Circuit also noted that "neither Spears nor his truck were known to the officers before he visited the New York House, and he had not previously been identified as a suspect connected with drug activity, the New York House, or" the suspected drug dealer; that "the officers did not observe Spears take any action besides parking in the driveway—specifically, they did not see Spears exit his truck, enter or exit the New York House, or talk to" the suspected dealer; and that the officers thus "had no way of differentiating Spears from a law-abiding visitor." Ibid.

There are similarities. But notably lacking in *Spears* is the presence of a reliable confidential informant who provided predictive information that came to fruition. In *Spears*, this meant that scant evidence suggested the defendant was transporting illicit cargo. To the contrary here, Vazquez by conduct fit the description of the predicted drug courier. For example, see *Navarette*, 572 US at 403 (finding tip from anonymous informant gave rise to reasonable suspicion for traffic stop, while observing that reasonable suspicion needn't rule out possibility of innocent conduct); *White*, 496 US at 331–32 (observing that corroboration of predictive "innocent details" provided by anonymous informant made the tip sufficiently reliable to create reasonable suspicion of criminal activity); but see *United States v Norbert*, 990 F3d 968 (5th Cir 2021), vacated and pending rehearing *en banc*, 2 F4th 505, 506 (5th Cir 2021, *per curiam*) (holding that, at least in context of non-predictive tip from unknown informant, corroboration of innocent information "'absent any corroboration of

the illegal activity itself' does not in and of itself provide a basis to conduct an investigatory stop," quoting *United States v Martinez*, 486 F3d 855, 864 (5th Cir 2007)).

In light of these cases and based on the totality of the circumstances, Villasana had the requisite reasonable suspicion to make the stop.

### B.   Collective knowledge doctrine

It was Villasana who had reasonable suspicion that Vazquez was involved in suspected drug activity. But it was Skero who ultimately stopped her. The question, then, is whether Villasana's knowledge is attributable to Skero.

The collective knowledge doctrine provides that "an officer initiating the stop or conducting the search need not have personal knowledge of the evidence that gave rise to the reasonable suspicion or probable cause, so long as he is acting at the request of those who have the necessary information." *United States v McPherson*, 630 F App'x 330, 331 (5th Cir 2016, *per curiam*), citing *United States v Ibarra*, 493 F3d 526, 530 (5th Cir 2007). The United States Supreme Court recognizes this as "a matter of common sense" because "it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction." *United States v Hensley*, 469 US 221, 231 (1985).

The doctrine without question applies to traffic stops based on reasonable suspicion that a vehicle is being used in the commission of a drug crime. See *United States v Ibarra-Sanchez*, 199 F3d 753, 759–60 (5th Cir 2007); *Powell*, 732 F3d at 371 n 4. In such circumstances, "detaining officers are 'not required to have personal knowledge of the evidence that created [the] reasonable suspicion,' if they conduct an investigative stop based on the request of officers who do possess a reasonable suspicion of criminal activity." *United States v Gonzalez-Rodriguez*, 456 F App'x 494, 500 (5th Cir 2012), quoting *Ibarra-Sanchez*, 199 F3d at 759 (alteration in original).

Villasana here was in close communication with Skero at the time of the stop. Villasana had met with him on the 15th, and so Skero knew both the reason for Villasana's investigation and "that we'd be conducting a traffic stop." Dkt 120 at 28. On the 16th, Villasana called or texted Skero to head towards the scene. Id at 55. Skero was also listening to the encrypted channel through which Villasana reported the events as they occurred. Id at 30–42 (Villasana testimony); 167–69 (Skero testimony). Villasana also testified to requesting that marked units should attempt to find a traffic violation, but "if not, we'll go ahead and—we'll just go ahead and make the stop." Id at 46, 59–60. Skero testified that he heard Villasana's instructions. Dkt 120 at 169–70.

All of this means that Skero was acting at the request of Villasana, who had "personal knowledge of the evidence that gave rise to the reasonable suspicion." *McPherson*, 630 F App'x at 331. The collective knowledge doctrine thus applies in this circumstance. It further means that the stop at issue was *justified at its inception*.

> b.   Scope of the stop

For an officer's subsequent actions to be *reasonably related in scope*, "a detention must be temporary and last no longer than necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Brigham*, 382 F3d at 507.

The scope of the stop at issue must relate to the purpose of the stop—reasonable suspicion of a drug crime. Of course, the valid basis for the stop wasn't articulated to Vazquez at the outset. Skero instead told her that the stop was for a traffic infraction. But as noted at the very outset of this section, precedent makes clear that the more severe basis for a stop needn't be specified to the suspect. See *Causey*, 834 F2d at 1184.

Even assuming that Skero had to remain within the scope of the stated investigation, his actions were reasonable when considered from the perspective of a stop following a traffic infraction. A stop for a traffic infraction

presents a much less severe circumstance than a stop on reasonable suspicion of narcotics trafficking, and so the allowable scope of action is more constrained. For example, law enforcement officers "may request a defendant's driver's license, insurance papers, and vehicle registration; run a computer check on those documents; and issue a citation." *United States v Davis*, 620 F App'x 295, 298 (5th Cir 2015). Officers questioning a defendant pursuant to a traffic stop may also "ask the defendant about the purpose of his trip" and "about unrelated matters so long as the questioning does not prolong the stop." Ibid.

Skero first asked Vazquez for her license and insurance—standard questions during any traffic stop. See *Brigham*, 382 F3d at 507. He immediately learned that she didn't have a license or insurance. Those are both offenses under the Texas Transportation Code, giving rise to further "reasonable suspicion that additional criminal activity warranting additional present investigation is afoot." *United States v Pack*, 612 F3d 341, 358 (5th Cir 2010). He then attempted to ascertain her identity, including questions regarding her address, job, and travel plans. See *Davis*, 620 F App'x at 298. When dispatch couldn't confirm her identity, he removed Vazquez from her vehicle for his own safety and asked whether Vazquez had anything illegal in her vehicle. See *United States v Reyes*, 963 F3d 482, 489 (5th Cir 2020) (asking whether there's anything illegal in suspect's vehicle doesn't unlawfully extend traffic stop). She answered in the negative and subsequently consented to a search of her vehicle (as discussed further below). See *Pack*, 612 F3d at 361 (noting that officer may attempt to "resolve his suspicion by requesting permission to search the vehicle"). During this search, Skero arrived at the box that ultimately contained the methamphetamine. He questioned Vazquez about it, who then specifically consented to the search of the box, resulting in the discovery of the methamphetamine. In sum, his actions reasonably related to the scope of the putative traffic stop and the other traffic offenses discovered thereafter.

It's thus clear that Skero's actions were also reasonable when considered from the perspective of a stop on reasonable suspicion of narcotics trafficking or possession, as a stop on such basis provides officers with much broader discretion. For instance, they may prolong the stop, ask questions reasonably related to ascertaining whether drug activity is occurring, and wait for a K-9 unit to arrive on the scene. For example, see *United States v Powell*, 732 F3d 361, 371 (5th Cir 2013), and *United States v Pack*, 612 F3d 341, 361–62 (5th Cir 2010). As such, Skero was entitled to take all of the actions noted above.

Moreover, had Skero stated the true reason for the stop—reasonable suspicion of drug activity—and Vazquez then withheld consent to search her vehicle or the package, inquiry would simply shift to the inevitable discovery doctrine. That doctrine is addressed below in other respects. But for purposes here, it means that Skero could have permissibly conducted a K-9 sniff. In fact, Skero had a K-9 unit on scene, and he testified that, had Vazquez not consented to the search, he would have conducted such a sniff. Dkt 100 at 54, 72; see also *Pack*, 612 F3d at 362 (finding thirty-five-minute stop reasonable based on officer's reasonable suspicion of drug activity).

Whether viewed in light of a stop for a traffic violation or for reasonable suspicion of drug activity, the actions taken by officers after the stop were reasonable. Simply put, the methamphetamine in the box that had already been observed being placed in Vazquez's vehicle back at the trailer home was permissibly found.

     c.   Consent

Vazquez's provision of consent has been mentioned briefly above as related to other points at issue. But it warrants closer scrutiny here.

When officers properly stop a suspect, they still need a legal basis to search the vehicle. The Fourth Amendment "generally requires police to secure a warrant before conducting a search." *Maryland v Dyson*, 527 US 465, 466 (1999). But voluntary consent is a specifically recognized

(and frequently litigated) exception to the Fourth Amendment's prohibition against warrantless searches. *Schneckloth v Bustamonte*, 412 US 218, 219 (1973).

The Fifth Circuit holds, "The government does not need a warrant if it receives: (i) consent; (ii) that is voluntarily given; (iii) by someone with actual or apparent authority; and (iv) the search does not exceed the scope of the consent received." *United States v Staggers*, 961 F3d 745, 757 (5th Cir 2020). The burden is on the government to prove by a preponderance of the evidence that it obtained consent. *United States v Santiago*, 410 F3d 193, 198–99 (5th Cir 2005). Consent is determined based on the totality of the circumstances. *Gates v Texas Department of Protective & Regulatory Services*, 537 F3d 404, 420 (5th Cir 2008). It doesn't have to be verbal and may be inferred from actions that reasonably communicate consent. See *Staggers*, 961 F3d at 757–58, citing *United States v Lewis*, 476 F3d 369, 381 (5th Cir 2007); see also *United States v Martinez*, 410 F App'x 759, 763 (5th Cir 2011). A mere nod of the head in response to an officer's request to conduct a search can be sufficient. See *United States v Guerrero*, 2014 WL 12615887, *3 (SD Tex); *United States v Gomez Diaz*, 2015 WL 9694519, *5 (ED Tex).

The video shows that Vazquez nodded—slightly, and somewhat nervously, but nodded nonetheless—when Skero asked whether he could search her car. Dkt 100 at 27–28; see also Dkt 117 (Ex 3) at 14:01:42. And she nodded again when he twice asked if he could search the box found in the rear storage area. Dkt 100 at 33–34; see also Dkt 117 (Ex 3) at 14:05:57. Nothing from the video suggests any coercive police procedures. That lack of coercive conduct coupled with Vazquez's indication of assent is enough for the Government to establish that she gave voluntary consent. See *United States v Ruigomez*, 702 F2d 61, 65 (5th Cir. 1983).

The provision of consent by Vazquez to search her vehicle and the box within it is a sufficient justification to support the search of her vehicle.

### d.   Inevitable discovery

Evidence that would otherwise be suppressed may nonetheless be admissible if it "would inevitably have been discovered by lawful means." *United States v Jackson*, 596 F3d 236, 241 (5th Cir 2012), citing Wayne R. LaFave, 5 *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(a) (West 3d ed 1996). The inevitable discovery doctrine applies if there's "a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct," and the investigating officers were "actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." *Jackson*, 596 F3d at 241.

The burden is on the government to demonstrate the doctrine's applicability by a preponderance of the evidence. *United States v Cherry*, 759 F2d 1196, 1204 (5th Cir 1985), citing *Nix*, 467 US at 444 n 5. This is no mere speculative exercise. See *United States v Zavala*, 541 F3d 562, 580 (5th Cir 2008). The "alternate means of obtaining the evidence must at least be in existence and, at least to some degree, imminent, if yet unrealized." Id at 580, quoting *Cherry*, 759 F2d at 1205 n 10 (quotation marks omitted).

The Government argues this point upon the possibility that stopping Vazquez based on the putative traffic violation might be found invalid. It notes that Villasana testified definitively that Vazquez was going to be stopped whether or not a traffic violation occurred. Dkt 120 at 46, 60. He flatly stated that this "was a narcotics investigation from the outset," and that the DEA "could have stopped them on our own if we wanted." Id at 46–47. And so the Government argued at the conclusion of the hearing that "the fact that there was a drug investigation would have meant that inevitably, you're correct, she would have been stopped whether they saw a traffic violation or not." Id at 199–200.

Consideration of the doctrine in that manner doesn't appear to be meaningfully different than the conclusion above that the stop was valid upon reasonable suspicion of drug activity. To say that Vazquez would have "inevitably"

been stopped because of the ongoing narcotics investigation simply returns the inquiry to the validity of the stop based on what was known and what had been observed that day. And it's already been determined that, once Vazquez departed the trailer home, sufficient reasonable suspicion existed to support the stop. Viewed in terms of the inevitable discovery doctrine, this means that, upon her departure, a sequence of events was set in motion that would inevitably lead to her stop and the discovery of the methamphetamine placed into her vehicle.

4.   Fifth Amendment issues

"The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Colorado v Connelly*, 479 US 157, 170 (1986). The Fifth Amendment privilege isn't "concerned with moral and psychological pressures to confess emanating from sources other than official coercion." Ibid (citations and quotation marks omitted). Instead, whether a waiver of the right against self-incrimination is valid depends on "the absence of police overreaching, not on 'free choice' in any broader sense of the word." Ibid.

Waiver of *Miranda* rights must be made voluntarily, knowingly, and intelligently. As such, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v Burbine*, 475 US 412, 421 (1986). Also, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Ibid. This means that courts must consider the totality of the circumstances to determine whether the waiver choice was uncoerced and the defendant had a "requisite level of comprehension." Ibid.

The statement obtained from Vazquez after the traffic stop doesn't run afoul of Fifth Amendment protections. She received *Miranda* warnings of sufficient clarity to allow her initially to invoke her right to remain silent, which was respected. See Dkt 117 (Ex 3) at 14:05:17 to 14:07:44; Dkt 100 at 32–38. She later unilaterally and of her own

29

accord asked to use her phone to call her child's father, whom she was supposed to meet in California. Skero allowed her to do so. At no point did he demand, request, or even suggest that she make the call. And Vazquez was sitting next to him in the car, so she was well aware that the call would occur in the presence of a law enforcement officer. See 118-4; Dkt 120 at 41–44.

Vazquez relies on *Rhode Island v Innis*, 446 US 291 (1980), arguing that allowing her to make the phone call created "a situation where a reasonable officer would know an incriminating statement could be made." Dkt 100 at 111. And she emphasizes that Skero told her *during the call* not to speak in Spanish. Id at 43, 110. But *Innis* held that, once the right to silence is invoked, an officer may not use any words or take any actions that "the police should know are reasonably likely to *elicit* an incriminating response from the suspect." 446 US at 301 (emphasis added). Granting a suspect's request to make a phone call doesn't run afoul of that standard. As Skero stated, "I had no idea what she was going to say. All I knew is she wanted to call her child's father to let him know that she wasn't coming to California for her daughter . . . I had no idea she was going to say everything else." Dkt 100 at 81. And as to his request that Vazquez speak English, Skero testified that he made this demand for the purpose of officer safety. Id at 79–81. That's permissible. Regardless, instruction to speak in English doesn't dictate or imply anything about the substance of the communication. And notably, with the bodycam video recording the conversation, even communication in Spanish would have been available for translation and use on the same basis. Dkt 118-4.

The totality of the circumstances demonstrates that Vazquez received her *Miranda* warnings and then voluntarily chose to make the challenged statement in the presence of a law enforcement officer. Such a statement wasn't obtained in violation of her Fifth Amendment right to remain silent.

5.   Conclusion

Officer Fernando Villasana had knowledge of evidence that gave rise to a reasonable suspicion of narcotics trafficking sufficient to stop the vehicle driven by Defendant Jamie Julissa Vazquez. Detective Bryan Skero made the actual stop at Villasana's request as permitted under the collective knowledge doctrine. Vazquez then consented both to the search of her vehicle and to the search of the box that led to the discovery of the methamphetamine. She also received her *Miranda* warnings and voluntarily chose to make the challenged statement in Skero's presence.

The motion by Vazquez to suppress the evidence against her is DENIED. Dkt 69.

SO ORDERED.

Signed on December 9, 2021, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge

31